# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TWENTY-THREE THOUSAND DOLLARS
($23,000.00) IN UNITED STATES CURRENCY,

        Defendant *in Rem*,

_____/

Civil No.
Honorable
Magistrate

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR FORFEITURE

NOW COMES Plaintiff, the United States of America, by and through TERRENCE

BERG, United States Attorney for the Eastern District of Michigan, and PHILIP A. ROSS,

Assistant United States Attorney, and states for its Complaint for Forfeiture *in Rem* as follows:

## JURISDICTION AND VENUE

1.     This is an *in rem* civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6).

2.     The Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1345 as

this action is being commenced by the United States of America as Plaintiff.

3.     This Court has jurisdiction over this forfeiture action, pursuant to 28 U.S.C. §

1355(b)(1)(A), as the acts giving rise to the forfeiture occurred in the Eastern District of

Michigan.

4.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part

of the events or omissions giving rise to the Government's claims occurred in the Eastern

District of Michigan.

5.    Venue is also proper before this Court pursuant to 28 U.S.C. § 1395(b), as the defendant

in rem was found and was seized in the Eastern District of Michigan.

**DEFENDANT IN REM**

6.    The defendant in rem in this action consists of Twenty-Three Thousand Dollars

($23,000.00) in United States Currency (the "defendant currency").

7.    The defendant currency was seized by agents of the United States Drug Enforcement

Administration ("DEA") on or about May 13, 2009, at the Detroit Metropolitan Airport in

Romulus, Wayne County, Michigan.

8.    The defendant currency has been deposited into the Department of Justice Seized Asset

Deposit Fund, maintained by the United States Marshals Service at the Federal Reserve

Bank.

**STATUTORY BASIS FOR CIVIL FORFEITURE**

9.    Title 21, United States Code, Section 881, governs the civil forfeiture of property which

constitutes or is derived from the proceeds of narcotics crimes, or which was used to

facilitate narcotics crimes:

> The following shall be subject to forfeiture to the United States and no
> property right shall exist in them....[a]ll moneys, negotiable instruments,
> securities, or other things of value furnished or intended to be furnished by
> any person in exchange for a controlled substance or listed chemical in
> violation of this subchapter, all proceeds traceable to such an exchange, and
> all moneys, negotiable instruments, and securities used or intended to be
> used to facilitate any violation of this subchapter.   21 U.S.C. § 881(a)(6).

2

## FACTUAL BASIS FOR CIVIL FORFEITURE

10.   Plaintiff asserts that the defendant currency is forfeitable to the United States of America as currency which was furnished, or was intended to be furnished, in exchange for a controlled substance; as proceeds traceable to such an exchange; and/or as monies which were used or were intended to be used to facilitate a violation of Title 21 of the United States Code and are, therefore, subject to seizure and civil forfeiture pursuant to U.S.C. § 881(a)(6).  The facts supporting this evidentiary determination include, but are not limited to, the following:

a.   On May 13, 2009, agents of the Drug Enforcement Administration ("DEA") were monitoring passengers at the Detroit Metropolitan Airport.

b.   Agents are aware, through training and experience, that flights departing and arriving from, to and through Phoenix, Arizona are commonly used by money and/or narcotic couriers.

c.   On May 13, 2009, Kevin Kelly was observed in the terminal at the Detroit Metropolitan Airport in Wayne County, Michigan, near a gate which was in the process of boarding a flight from Detroit to Phoenix, Arizona.

d.   Agents observed Mr. Kelly use his left hand and pat the outside of his pants pocket several times, which appeared to contain a large bundle.

e.   When the gate agent announced boarding for Flight 1587 to Phoenix, Arizona, Agents observed Mr. Kelly check his left pants pocket again and proceed to the boarding area.

3

f.  Agents also proceeded to the boarding area and, after identifying themselves to the gate agent, positioned themselves on the jetway so as not to block freedom of movement for oncoming passengers.

g.  Agents initiated contact with Mr. Kelly, by introducing themselves as law enforcement officers and displaying their law enforcement credentials.

h.  Mr. Kelly agreed to speak with the agents.

i.  Upon request, Mr. Kelly handed his Michigan driver's license and boarding information to one of the agents.

j.  After noting that Mr. Kelly had a ticket for US Airways Flight 1547 to Phoenix, Arizona with a return to Detroit two days later on NWA Flight 256, the documents were returned to Mr. Kelly.

k.  The agents asked Mr. Kelly about his purpose of travel. Mr. Kelly related the following:

   i.  he (Kelly) had purchased his airline ticket via credit card a couple of days earlier;

   ii.  he was traveling to Chandler, Arizona, to visit his girlfriend;

   iii.  he had no idea where, in Chandler, his girlfriend lived, as she had moved nine months ago; and

   iv.  that he had been in Phoenix only once before;

l.  When asked if he was carrying any narcotics or large amounts of money, Mr. Kelly responded that he was carrying about $8,500.

4

m.   Agents asked Mr. Kelly where he was carrying the money and Mr. Kelly indicated his left front pants pocket.

n.   Agents asked to see the money, and Mr. Kelly put his hand into his left front pants pocket and pulled out one bundle of U.S. currency, folded over and rubber-banded into a single stack.

o.   The bills appeared to be all one-hundred dollar bills and appeared to be worn from street use, consistent with the appearance of narcotic related street use.

p.   Agents asked Mr. Kelly how much money was in the bundle, and Mr. Kelly replied that it was $8,500.

q.   Agents asked Mr. Kelly if he was carrying any more currency, to which Mr. Kelly replied in the negative.

r.   Agents asked Mr. Kelly if he would voluntarily take another flight to Phoenix, as they had further questions about the currency.  Agents indicated that they would re-book Mr. Kelly on the next available US Airways flight at 11:15 a.m, and Mr. Kelly voluntarily agreed to take another flight.

s.   As Mr. Kelly was following agents off of the jetway, he said in a low tone of voice, "I won't be going without any money."

t.   Agents asked Mr. Kelly if he was speaking, and Mr. Kelly replied that he was talking to himself.

u.   Agents re-booked Mr. Kelly on the 11:15 a.m. U.S. Airways flight, then walked with Mr. Kelly to an interview room at the North Terminal office.

v.    In response to questions from the agents, Mr. Kelly related the following:

    i.    he purchased his airline tickets on his credit card a couple of days earlier, but was unsure of the costs of the tickets;

    ii.    he makes a living as a real estate agent, but he is not a licensed real estate agent;

    iii.    he usually earns annually between $20,000 and $30,000, selling 3-4 houses a year in the Detroit area;

    iv.    the purchasers pay for the houses in cash;

    v.    he has not sold any houses in 2009;

    vi.    the last house he sold was on 20310 Plainview in Detroit for approximately $98,000;

    vii.    he does not recall the addresses for any other houses he sold; and

    viii.    he uses many different title companies to complete the sale of houses.

w.    When agents asked about the last title company used by Mr. Kelly, he readily replied that he used "Title One" located on Telegraph and Twelve Mile roads, and provided the telephone number of 313-971-8121.

x.    With regard to whether he ever filed state or federal income taxes, Mr. Kelly stated that he paid $1,700 on Schedule C in 2008.

y.    In response to questions about his visit to his girlfriend in Arizona, Mr. Kelly related the following:

    i.    the name of his girlfriend is Quann Thompson;

    ii.    Ms. Thompson moved to Chandler, Arizona, about nine months earlier because she could not find a job in Michigan;

    iii.    she does odd jobs for a living; and

    iv.    he has known Ms. Thompson for a while, and speaks with her a lot.

z.    When agents asked for his girlfriend's telephone number, Mr. Kelly had to look up the number in his cell phone.

aa.    Agents called the number provided by Mr. Kelly, but no one answered the call, and voicemail was not available.

bb.    In response to questions about Mr. Kelly's banking activities, he responded with the following:

    i.    he uses Charter One bank, whichever one is nearby;

    ii.    he has about $65,000 in his account; and

    iii.    he could not remember when his last deposit or withdrawal occurred.

cc.    Mr. Kelly was not specific in response to a question about the length of time he carried the $8,500.

dd.    When asked further details about the source of the money, he stated that he had withdrawn $12,000 at the end April and $8,000 or $9,000 at the beginning of May from Charter One bank.

ee.    Mr. Kelly indicated that he hid the money that he withdrew around his house and that all of the money was now in his pants pocket; he confirmed that amount to be $8,500.

ff.     Mr. Kelly told agents that in August of 2000, approximately $31,250.00 was seized from him in St. Louis, Missouri.

gg.     Mr. Kelly indicated that he had been to Arizona about four times and that the last time he traveled to Arizona was around April 20, 2009, for a couple of days.

hh.     When agents asked him why his April stay was so short, he stated that he bought a GMC Sierra truck.

ii.     Agents asked Mr. Kelly if they could search his carry-on bag, and Mr. Kelly agreed.

jj.     The bag contained one brand new white shirt (tags still attached); two used T-shirts; two pairs of boxer shorts; one pair of brand new blue jeans; and one pair of new white, high-top tennis shoes.

kk.     The agents checked the clothing and found the pockets empty.

ll.     Agents then checked the tennis shoes, which appeared to have been altered as the soles were raised.

mm.     Agents found, hidden underneath the sole of each shoe, several one-hundred dollar bills.

nn.     When asked about the hidden money, Mr. Kelly indicated that the money was his, that he had withdrawn it from the bank the prior month, and that he was going to Arizona for a good time.

oo.     Mr. Kelly indicated that he had, altogether, approximately $20,000.

pp.     When agents asked him why he did not mention the hidden currency earlier, Mr.

Kelly only responded that he had bank receipts for the money.

qq.   Agents asked Mr. Kelly if there were any reasons a controlled substance canine would alert to the currency, to which Mr. Kelly replied in the negative, as the currency had been in his house the entire time.

rr.   Mr. Kelly indicated that he smokes marijuana occasionally, and had smoked marijuana the prior day.

ss.   Agents performed a canine examination of the North Terminal break room for the odor of controlled substances, prior to hiding the defendant currency in the break room.  A canine trained to detect the odor of controlled substances, or their derivatives, did not alert to any substances in the break room, and the canine was led out of the break room.

tt.   With the canine out of the break room, agents hid the defendant currency, and the canine was returned to perform another search for controlled substances in the break room.  The canine alerted positively to the odor of narcotic residue on the defendant currency.

uu.   When agents asked Mr. Kelly if he had anything else to say, he replied in the negative.

vv.   Mr. Kelly was provided with a receipt for the undetermined amount of United States Currency (the defendant currency) that was found in his front left pants pocket and in his shoes.

ww.   In conducting further investigation, Agents could not locate any records for Title

9

One Record Keeping company at the location provided by Mr. Kelly.

xx.   Records for the sale of a residence on 20310 Plainview, Detroit, listed the following company as the title agency for the sale:  Regency Title, 20245 W. Twelve Mile Road, Suite 120, Southfield, Michigan 48076.

yy.   Investigation into Regency Title at 20245 W. Twelve Mile Road address revealed that the building is currently for sale.

zz.   The current occupant of Suite 120 at 20245 W. Twelve Mile Road indicated that Regency Title has not been located at that address for at least the last three years.

aaa.   Additional investigation revealed that the telephone number provided by Mr. Kelly for the Title One company appears to belong to Mr. Kelly.

bbb.   A further review of law enforcement databases revealed that Mr. Kelly had the following criminal convictions:

| Arrest | Disposition Date | Disposition |
|---|---|---|
| 12/21/88 Detroit | 03/28/89 | Detroit Recorder's Court - Found Guilty of 1 Felony Count for Possession of Controlled Substance between 25-49 grams. Sentenced to prison for 1-4 years. |
| 4/24/91 Detroit | 10/22/91 | Detroit Recorder's Court - Found Guilty of 1  Felony Count for Possession of Controlled Substance (cocaine) less than 25 grams.  Sentenced to prison for 2-4 years. |
| 12/17/97 Detroit | 09/16/98 | 3rd Circuit Court - Found Guilty of 1 Felony Count of Fourth Degree Fleeing and Eluding.  Sentenced to 2 years probation. |

## CLAIM

11.     The United States hereby incorporates by reference, repeats and re-alleges each and every

allegation set forth in Paragraphs One through Ten above, including all subparagraphs

therein.

12.     The Defendant Twenty-Three Thousand Dollars ($23,000.00) in United States Currency

is forfeitable to the United States of America pursuant to 21 U.S.C. § 881(a)(6) because it

is currency which was furnished or was intended to be furnished in exchange for a

controlled substance, and/or because it constitutes proceeds traceable to such an

exchange, and/or because it represents moneys used or intended to be used to facilitate a

violation of Title 21 of the United States Code.

## DEMAND FOR JURY TRIAL

Plaintiff United States of America respectfully requests a trial by jury in this case.

## RELIEF

WHEREFORE Plaintiff, the United States of America, respectfully requests that a

Warrant for Arrest of the defendant currency be issued; that due notice be given to all interested

parties to appear and show cause why the forfeiture should not be decreed; that judgment be

entered declaring that the defendant currency be condemned and forfeited to the United States of

America for disposition according to law; and that the United States of America be granted such

11

other further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

TERRENCE BERG
United States Attorney

PHILIP A. ROSS
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3211
(313) 226-9790
philip.ross@usdoj.gov
VA Bar No. 70269

Dated: October 6, 2009

## VERIFICATION

I, Joseph A. Wach, state that I am a Task Force Agent with the United States Drug Enforcement Administration. I have read the foregoing Complaint for Forfeiture and declare under penalty of perjury that the facts contained therein are true and correct based upon knowledge possessed by me and/or upon information received from other law enforcement agents.

Joseph A. Wach, Task Force Agent
U.S. Drug Enforcement Administration

Dated: October 6, 2009

12